# IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION AT NASHVILLE

CONNIE A. WILLIAMS,                )
(Now Montgomery)                   )
                                   )
  Respondent/Counter-Petitioner/Appellant  )    Putnam Circuit No. NJ-3698
                                   )
                                   )
vs.                                )
                                   )    Appeal No. 01A01-9610-CV-00468
MICHAEL C. WILLIAMS,               )
                                   )
Petitioner/Counter-Respondent/Appellee.  )

FILED

May 23, 1997

Cecil W. Crowson
Appellate Court Clerk

APPEAL FROM THE CIRCUIT COURT OF PUTNAM COUNTY
AT COOKEVILLE, TENNESSEE

THE HONORABLE JOHN A. TURNBULL, JUDGE

For the Respondent/Counter-Petitioner/          For the Petitioner/Counter-Respondent/
Appellant:                                       Appellee:

Rankin P. Bennett                                Craig P. Fickling
Cookeville, Tennessee                            Cookeville, Tennessee

**REVERSED IN PART, AFFIRMED IN PART
AND REMANDED**

HOLLY KIRBY LILLARD, J.

CONCURS:

ALAN E. HIGHERS, J.

DISSENTS IN PART, CONCURS IN RESULT:

BEN H. CANTRELL, J.

**OPINION**

This is a child custody case. In 1991, the parties divorced pursuant to a marital dissolution agreement. Under the agreement, the mother, Connie A. Montgomery (formerly Williams), was awarded custody of the parties' sons, with visitation to the father, Michael C. Williams. Subsequently, Mr. Williams filed a petition for change of custody, which was granted by the trial court. We find insufficient change of circumstances to justify a change of custody and reverse the decision of the trial court.

In 1991, the parties entered into a Marital Dissolution and Child Custody Agreement ("Agreement"), which was incorporated into the Final Decree of divorce. Under the Agreement, Connie Montgomery ("Mother") was awarded custody of the parties' twin sons, Ross and Ryan, with visitation to Michael C. Williams ("Father"). Father was required to pay child support biweekly to Mother.

The Final Decree also incorporated an Order of Protection, under which it was determined that Mother had proven allegations of physical abuse. Prior to the divorce, Mother had filed a petition for a protective order, alleging that Father had pulled a gun on her and had been physically abusive toward her when he drank alcohol. The Order of Protection enjoined Father from further acts of violence toward Mother.

Subsequently, Father became in arrears on his obligation to pay child support, with the arrearage eventually totaling $6,894.49. An advance notice of income assignment for payment of the delinquency was filed in October, 1993. In December, 1993, Father filed a petition for change in custody, also seeking a cessation of his child support obligation, stating that he had remarried and alleging a material change in circumstances. Mother filed an answer and counter-petition, alleging Father had unclean hands due to his failure to pay child support and seeking a finding of contempt against Father on that basis. In February, 1994, the trial court entered an agreed order of income assignment for payment of the arrearage, with a ten-day jail sentence stayed upon compliance with the Order to pay the arrearage and the continuing child support payments.

Two hearings were held on Father's petition to change custody. The parties' sons were twelve years old at the time. At the first hearing, Father testified that the boys had expressed hostility toward Mother's boyfriend, Mr. Kenny Maynard. Father introduced into evidence two notes by the boys referring to "hiring a hit man" to kill Mr. Maynard, and another note referring to Mr. Maynard's drinking "Bartels and James" wine coolers at Mother's house. Father testified that,

while visiting Father's home, the boys, in playing with toy soldiers and guns, had said, "Death to Kenny." Father also testified that the boys had called him from Mother's home and told him that they were under a bed in their room because they did not want Mr. Maynard to hear them talking to Father. He stated that the boys had complained of Mr. Maynard's smoking and drinking in their presence. Father testified that all of these incidents had occurred over a period of approximately two years.

On cross-examination, Father denied being in arrears on his child support obligation, denied physically abusing Mother, denied that Mother obtained an Order of Protection from such abuse, and acknowledged that he had worked at eleven different places of employment since the parties' divorce. Father testified that his current wife had stayed overnight at his home prior to their marriage while the parties' sons were present. He acknowledged drinking alcohol after the divorce but said he had quit three years earlier. He stated that he had smoked until eight months prior to the hearing.

Father then submitted the testimony of his expert psychologist, Dr. Roy Bilbrey. Dr. Bilbrey did not treat the parties' sons, but interviewed them on several occasions at Father's request. Dr. Bilbrey described expressions of hostility toward Mr. Maynard similar to those described by Father, including the boys' stated belief that Mr. Maynard had killed their cat. Dr. Bilbrey testified that one twin had told him that he wanted to live with Father and the other had told him he did not want to change the current arrangement, with Mother having custody. Father's current wife, Donnia Williams, testified that she had a good relationship with the parties' sons and described their activities together. She stated that the boys had told her that they wanted to live with her and Father.

Mother testified that she had been the boys' primary caregiver for twelve years, since their birth. She testified that she had been employed operating machinery at Tutco for twenty-two years, and that she had been primarily responsible for providing for the boys' needs. She indicated that Father had periodically been in arrears on his obligation to pay child support, and on one occasion failed to pay any child support for a period of a year and a half. During this time, she testified, she worked two additional jobs, a total of sixty to sixty-five hours per week, to provide for the boys' needs.

Mother testified further of her extensive involvement with the boys' schoolwork and extracurricular activities. She indicated that Father rarely participated in such activities. She

2

testified that, prior to the parties' divorce, Father had physically abused her in the children's presence and that that was the reason she obtained the Order of Protection that was incorporated into the divorce decree.

Mother testified that she dated Kenny Maynard and that he visited her home, but had never spent the night there while the children were present. She stated that he did not drink alcohol in front of the children and that he had a good relationship with the boys. She said that Mr. Maynard had taken the boys to extracurricular activities and sports events. Mother stated that the boys had never indicated any hostility toward Mr. Maynard, had never indicated a belief that Mr. Maynard killed their cat, and had never told her that they wanted to live with Father. She testified that one of the twins had said that he had stomachaches while at Father's home and that the other twin's grades had fallen since Father filed his petition to obtain custody.

Mr. Maynard stated in his testimony that he had worked as a truck driver for Genco for ten years. He testified that he had dated Mother for three years and had never stayed overnight at her home while the children were present. He stated that he had a good relationship with the boys and described extracurricular and sports activities he had participated in with them. He testified that he did not discipline the twins, that that was their mother's job. He denied injuring the boys' pet. He acknowledged that he had smoked but said that he quit two years prior to the hearing. He indicated that he had shot a pistol in Mother's back yard on one occasion. Mr. Maynard testified that he had asked Mother to marry him but that she had refused because she had promised her sons that she would not remarry, due to their fear that a new husband would hurt her as Father had done.

The trial judge then interviewed the parties' sons in chambers. The boys indicated that they love both of their parents. They described both Donnia Williams and Kenny Maynard as "nice" and stated that they got along well with both of them. They acknowledged writing two notes expressing hostility toward Mr. Maynard and said they did it because they were "mad" at Mr. Maynard. They said they had seen Mr. Maynard drink a beer while barbecuing outside. They denied believing that someone had injured their cat, but Ross acknowledged that he had told Father's expert, Dr. Bilbrey,

3

that he thought Mr. Maynard had killed it. Ryan told the trial judge that he had stomachaches at Father's house more often than at Mother's house.

The trial judge then told the parties that he wanted their sons to be evaluated by their treating psychologist, Dr. John Averitt, and that he wanted Dr. Averitt to report to the court, particularly about the boys' notes regarding Mr. Maynard.

Dr. Averitt had been referred to treat the boys by their pediatrician. In his deposition submitted to the trial court, Dr. Averitt testified that he had previously treated the boys for anxiety symptoms that appeared after Father initiated proceedings to obtain custody. He stated that both boys were stressed by their parents' conflict and did not want to upset or disappoint either parent. He testified that both boys told him that they were "happy with the arrangements as they were" and "wanted to be with their mother."

In his report to the trial court, Dr. Averitt said that the twins resisted admitting that they had written the notes about Mr. Maynard, feeling that they had done something "very wrong." They denied that anyone had coached them in advance about the session with Dr. Averitt. The report stated:

> The boys both indicated that they like Donna [sic] and Kenny. Both denied fearing Donna [sic] or Kenny. Ryan said that "Ross got mad at Kenny one night because he was arguing with momma." He denied that Kenny hit his mother. He also noted that the argument happened "a long time ago."
>
> Ryan said, "My cat got ran over, and Ross said that Kenny killed it." I was mad at Kenny then. Ross said that he was just, "kidding" when he said that Kenny killed the cat.
>
> Ryan said that the notes written by Ross (exhibit 1) were written, "a long time ago." Ryan said, "Ross left them laying around and Dad found them." He said that Dad "was happy" when he found them. He noted that it seemed to please his father to know they were mad at Kenny.
>
> I asked them if they had talked with anyone about these notes. Ross said, "We talked to Bilbrey." I assume they referred to Roy Bilbrey, Ph.D. I asked them whey [sic] they told Dr. Bilbrey. Ryan said they told him they wanted to live with their Dad, and that they were mad at Kenny.
>
> I asked them if they told Dr. Bilbrey the truth. Each boy said that they wanted to "keep things as they are." Ryan said, "I don't hate Kenny." Ross said, "No we don't hate him." I asked if they fear Kenny. Ross and Ryan each said, "No."
> * * *
> These boys love each of their parents but feel a strong need to please both of them. I appreciate the Court's not questioning the boys as to their preference as to custodial parent. These boys are both too immature emotionally to handle that decision at present. The feeling of guilt they would assume if they felt responsible for the decision would be most stressful to them.

4

My evaluation is that the boys do not fear Kenny or Donna [sic]. They appear to be happy with their current living arrangements but do not wish to disappoint their father. The negative statements by the boys in the notes and in psychological evaluations appear to be secondary to their need to please both parents--an impossible task.

At the second hearing on this matter, Mr. Williams testified that he had changed jobs yet another time since the previous hearing. Mother presented testimony and stipulated statements from eleven witnesses: relatives, teachers, coaches, and others in contact with Mother and the twins. These witnesses testified that Mother was a good parent, that she was involved in school and sports activities, that the boys had a good relationship with Mr. Maynard, that Mr. Maynard did not live at Mother's home and did not engage in inappropriate conduct, and that Father had rarely participated in the twins' school or sports activities.

After hearing all the proof and assessing the demeanor and credibility of the witnesses who testified at the hearings, the trial court issued an order from the bench granting custody to Father, and later entered written findings of fact and conclusions of law. In its written findings, the trial court found that a substantial change of circumstances had occurred since the final decree of divorce was entered granting custody to Mother. The trial court found the following changes in circumstances:

1. The improvement in Mr. Williams' mental and emotional status since the divorce;
2. The improvement in Mr. Williams' job stability since the divorce;
3. Mr. Williams' marriage to a responsible, caring and loving woman;
4. Mr. Williams' establishment of a stable family atmosphere;
5. Ms. Williams' keeping of company with Mr. Maynord [sic] without the benefit of wedlock in what the Court considers to be an unstable relationship.

The trial court then did a comparative analysis on the issue of custody, focusing on the factors set forth in Tennessee Code Annotated § 36-6-106.

In its comparative fitness analysis, the trial court indicated that the boys love both parents and noted that Father had failed to pay child support, while Mother had at times held down more than one job to support the children. The trial court also noted the importance of continuity and the length of time the children had lived with Mother since the divorce.

5

The trial court then found that Father and his current wife have a stable family unit. It stated that Mother:

> has for the past many months kept company with Mr. Kenny Maynord [sic] without the benefit of wedlock. Although the proof is not satisfactory that Mr. Maynord [sic] has spent the night in the home when the boys were present, it is clear that boys of this age understand the nature of their mother's relationship with Mr. Maynord [sic]. The Court finds that there is a certain amount of resentment to this relationship and to Mr. Maynord [sic] on the part of Ross Williams.

The trial court stated its positive impression of Father's current wife and that it was "not as impressed" with Mr. Maynard. It then stated:

> The final and perhaps decisive factor in the Court's judgment that these two young men need a steady, strong, male influence in their lives. They are at the point of becoming young men. . . . [T]he chances that these boys will reach mature, productive adulthood in [sic] enhanced by their being placed in the custody of their father, Mr. Williams.

The trial court then ordered that the parties' sons be placed in the custody of Father, with visitation for Mother.

The trial court found that Father remained in arrears on his child support obligation, with the amount at that time totaling $6,127.84, including interest. It ordered him to pay the arrearage to Mother in weekly payments but also ordered Mother to pay child support to Father.

Mother now appeals the trial court's change of custody to Father. Mother argues that the trial court erred in finding that there had been a sufficient change in circumstances to justify a new evaluation of the issue of custody. In the alternative, Mother contends, even if there were a change in circumstances, the evidence preponderated against the determination that placing custody with Father was in the best interest of the children. Father argues that the proof established a significant change in circumstances and that the evidence preponderated in favor of the trial court's decision to change custody to Father.

Our review of the trial court's findings of fact is *de novo* upon the record, accompanied by a presumption of the correctness of the trial court's factual findings. Tenn. R. App. P. 13(d). No such presumption attaches to the trial court's conclusions of law. *Adams v. Dean Roofing Co.*, 715 S.W.2d 341, 343 (Tenn. App. 1986).

Under the doctrine of res judicata, a second suit on the same cause of action between the same parties is barred with respect to all issues which were or could have been litigated in the first lawsuit. *Wall v. Wall*, 907 S.W.2d 829, 832 (Tenn. App. 1995). Therefore, an order awarding

6

custody cannot be changed in the absence of a showing of new facts or "changed circumstances" requiring an alteration of the original custody award. *Woodard v. Woodard*, 783 S.W.2d 188, 189 (Tenn. App. 1989). On a petition to change custody, the trial court does not simply repeat the comparative fitness analysis usually done at the time of the original custody decree. Rather, the trial court must first find a material change in circumstances "compelling enough to warrant a change in custody." *Short v. Short*, No. 03A01-9506-CH-00168, 1995 WL 728521, at *2 (Tenn. App. Dec. 11, 1995); *see also Woodard*, 783 S.W.2d at 189-90. This analysis was discussed in *Wall*:

> When two people join in conceiving a child, they select that child's natural parents. When they decide to separate and divorce, they give up the privilege of jointly rearing the child, and the divorce court must decide which parent will have primary responsibility for rearing the child. This decision of the Court is not changeable except for "change of circumstances" which is defined as that which requires a change to prevent substantial harm to the child. Custody is not changed for the welfare or pleasure of either parent or to punish either parent, but to preserve the welfare of the child. Custody is not changed because one parent is able to furnish a more commodious or pleasant environment than the other, but where continuation of the adjudicated custody will substantially harm the child.

*Wall*, 907 S.W.2d at 834. The type of behavior by the custodial parent required to justify a change in custody was discussed in *Musselman v. Acuff*, 826 S.W.2d 920 (Tenn. App. 1991), in which the appellate court reversed the trial court's decision to change custody from the mother to the father. The *Musselman* court quoted a Mississippi decision in which the trial court had removed a child from his mother's custody because she had cohabited with a lover:

> "Furthermore, it was manifest error to hold that the facts and circumstances of this case supported a modification of this child's custody. It must be recognized that uprooting a child from his mother, school and environment was a jolting, traumatic experience. It is only that behavior of a parent which clearly posits or causes danger to the mental or emotional well-being of a child (whether such behavior is immoral or not), which is sufficient basis to seriously consider the drastic legal action of changing custody. This case not [sic] not remotely reach any such proportion."

*Musselman*, 826 S.W.2d at 923-24 (quoting *Ballard v. Ballard*, 434 So. 2d 1357, 1360 (Miss. 1983)). This Court has repeatedly emphasized the importance of stability for children involved in a divorce:

> [T]he stability provided by the continuation of a successful relationship with a parent who has been in day to day contact with a child generally far outweighs any alleged advantage which might accrue to the child as a result of custodial change. In short, when all goes well with children, stability, not change, is in their best interests.

*Contreras v. Ward*, 831 S.W.2d 288, 290 (Tenn. App. 1991) (quoting *Sartoph v. Sartoph*, 354 A.2d 467, 473 (Md. 1976)).

7

In sum, then, in determining whether to change custody, the noncustodial parent has the burden of proving a material change in circumstances, that is, behavior by the custodial parent which clearly endangers the well-being of the child. Only after it is determined that such a material change in circumstances has occurred does the trial court perform a comparative fitness analysis to determine if custody should be changed. Efforts by the noncustodial parent to improve his or her circumstances are insufficient to support a determination of material change in circumstances; they are usually relevant only to the comparative fitness analysis performed after there has been a threshold finding of a material change in the circumstances of the custodial parent.

In this case, the trial court found five changes in circumstances since the parties' divorce. The first four factors related to improvement in Father's circumstances since the divorce.[1] Such improvements regarding Father normally would become relevant only after it had been determined that there had been a material change in circumstances regarding Mother.

The last change in circumstances found by the trial court was "Mrs. Williams' keeping of company with Mr. Maynord [sic] without the benefit of wedlock in what the Court considers to be an unstable relationship." The trial court acknowledged that the proof was "not satisfactory" that Mr. Maynard had spent the night at Mother's home when the boys were present but stated that "boys of this age understand the nature of their mother's relationship with Mr. Maynord [sic]." The trial court found that Ross Williams had "a certain amount of resentment" toward Mr. Maynard and that there existed "some hostility" between the boys and Mr. Maynard. On this basis, the trial court changed custody to Father.

The record contains conflicting proof regarding the twins' hostility toward Mr. Maynard. It is undisputed that one or both boys wrote two notes referring to "hiring a hit man" for Mr. Maynard and made other remarks about Mr. Maynard. Father's expert, Dr. Bilbrey, concluded that the boys harbored hostility toward Mr. Maynard. However, the boys told the trial judge in chambers that Mr. Maynard was "nice." After the trial judge ordered the boys' treating psychologist, Dr. Averitt, to examine them, Dr. Averitt concluded that the twins did not dislike or fear Mr. Maynard but made negative statements about Mr. Maynard in an effort to please Father. Mother presented numerous

---

[1]One of the changes found by the trial court was "[t]he improvement in Mr. Williams' job stability since the divorce." This finding is puzzling in light of Mr. Williams' testimony in the first hearing that he had held eleven job positions since the divorce, and his testimony at the second hearing that he had changed jobs since the first hearing.

8

witnesses who testified that Mr. Maynard engaged in various activities with the parties' sons and had a good relationship with them.

The trial judge, of course, had the opportunity to observe the witnesses' demeanor during their testimony, and the weight and credit accorded the witnesses by the trial judge is entitled to great weight. *In re Parsons*, 914 S.W.2d 889, 895 (Tenn. App. 1995). There was sufficient evidence in this case to support the trial court's finding that the boys harbored "some hostility" and "some resentment" toward Mr. Maynard.

However, the record does not contain evidence from which the trial court could conclude that Mother's relationship with Mr. Maynard was "unstable" or that the "nature" of the relationship was improper or injurious to the twins. The evidence is unrefuted that Mother and Mr. Maynard had dated steadily for three years, that both had been employed in their respective job positions for many years, that Mr. Maynard had not spent the night at Mother's home while the boys were there, that Mr. Maynard lived with his widowed mother and not with Mother, and that Mother and Mr. Maynard had not married only because of the twins' fear that a new husband would abuse her as Father had. While this Court gives deference to the trial court's observation that it was "not as impressed" with Mr. Maynard, the record does not contain proof from which the trial court could conclude that Mr. Maynard had engaged in substantial inappropriate behavior in the boys' presence. The record includes testimony that Mr. Maynard once fired a pistol in Mother's back yard, that he had drunk a beer there while outside barbecuing, and that he smoked until two years prior to his testimony. Particularly when viewed against the backdrop of Father's past conduct, such as his physical abuse of Mother, his drinking and smoking, and having his current wife, prior to their marriage, spend the night in his home while the boys were there, Mr. Maynard's conduct does not support a finding of a material change in circumstances.

The record demonstrates that the remainder of the circumstances surrounding Mother's care of the children are unchanged. She remains employed at Tutco, as she has been for twenty-two years, she remains in the same home the parties occupied during their marriage, the boys' schoolwork remained satisfactory until they learned of Father's petition to change custody, and Mother has continued to be heavily involved in the boys' school and extracurricular activities.

9

Viewed as a whole, and considering the importance placed on stability for children in divorced families, the evidence does not support a finding that Mother has engaged in or permitted Mr. Maynard to engage in "behavior . . . which clearly posits or causes danger to the mental or emotional well-being of a child . . . which is sufficient basis to seriously consider the drastic legal action of changing custody." *Musselman*, 826 S.W.2d at 924; *see also Contreras*, 831 S.W.2d at 290 (regarding stability). Therefore, Father has not carried his burden of demonstrating a change in circumstances sufficiently compelling to warrant changing custody.

Even if such a change in circumstances were present, the evidence regarding the comparative fitness analysis between Mother and Father does not preponderate in favor of an award of custody to Father. *See* Tenn. Code Ann. § 36-6-106 (1996). The evidence is undisputed that Mother has been the boys' primary caregiver for twelve years, since their birth, and that she has worked steadily to provide for their material needs, even working multiple jobs at times when Father failed to pay child support. The proof also establishes that Mother has provided a stable home for the boys and is a stable parent. Numerous witnesses testified regarding Mother's involvement in the boys' school and extracurricular activities, and testimony established that the boys did well in school while in Mother's custody, except after Father's petition for a change in custody was filed.

In contrast, Father has not been the boys' primary caregiver. His consistent arrearage in child support, while not determinative, is significant in assessing his dedication as a parent, and it is noteworthy that his petition to change custody was filed only after Mother initiated efforts to collect the arrearage. While Father has remarried, his employment has remained unstable. The evidence was undisputed that Father was largely uninvolved in the boys' school and sports activities.

The last factor to be considered is the character and behavior of any other person who resides in or frequents the parent's home. Tenn. Code Ann. § 36-6-106(9)(1996). The trial court stated that it was "impressed" with Father's current wife, Donnia Williams, noting her love, caring, support, and genuine interest in the twins. The trial court also stated that it was "not as impressed" with Mr. Maynard. This is an important factor, and this Court gives great weight to the trial court's ability to view the witnesses and assess their demeanor. *See In re Parsons*, 914 S.W.2d at 895. However, while there is evidence to support the trial court's finding that the boys had "some hostility" toward Mr. Maynard, as noted above, the evidence does not support a finding that Mr. Maynard engaged in substantial behavior detrimental to the twins. Moreover, while another person who resides in or

10

frequents the parent's home is a significant consideration, the primary comparison regarding fitness for custody remains between the two *parents*.

The trial court also noted as a "decisive" factor the fact that the parties' sons "need a steady, strong, male influence in their lives." Children of both genders, of course, need a healthy influence from both their male and female parents or guardians. Involvement by Father in the parties' sons' school and extracurricular activities would help provide the boys with a more significant male influence in their lives.

In sum, the evidence does not support the trial court's finding of a change in Mother's circumstances sufficiently compelling to warrant a change in custody from Mother to Father. Moreover, even if there were such a change in circumstances, the evidence preponderates against the trial court's determination that, in comparison, Father is the more fit of the two parents to have custody.

The trial court's award of custody to Michael C. Williams is reversed. The trial court's order requiring Mr. Williams to make payments on his arrearage in child support remains in effect. The cause is remanded to the trial court for further proceedings regarding a transfer in custody, appropriate visitation with Father, insurance matters, any remaining child support arrearage, future child support, and other pertinent matters.

The order of the trial court is reversed in part, affirmed in part, and remanded for further proceedings consistent with this Opinion. Costs are assessed against Appellee, for which execution may issue if necessary.



_____
_____HOLLY KIRBY LILLARD, J.

**CONCUR:**

_____
**ALAN E. HIGHERS, J.**


_____
**BEN H. CANTRELL, J.**

11